**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KAHDAFFIE GREEN<br><br>Defendant. | 24CR00566-1<br>Judge Rebecca Pallmeyer |

# DEFENDANT KAHDAFFIE GREEN'S SENTENCING MEMORANDUM

**TABLE OF CONTENTS**


**TABLE OF CONTENTS** ........ i

**TABLE OF AUTHORITIES** ........ iii

**DEFENDANT'S SENTENCING MEMORANDUM** ........ 1

**I. OVERVIEW OF SENTENCING REQUEST AND GUIDELINE CALCULATION** ........ 1

**II. THE NATURE AND CIRCUMSTANCES OF THE OFFENSES IN VIEW OF KAHDAFFIE'S CO-DEFENDANTS JUSTIFY A SENTENCE OF 90 MONTHS** ........ 2

**III. § 3553(a)(6): THE COURT MUST AVOID UNWARRANTED SENTENCING DISPARITIES AMONG DEFENDANTS** ........ 3

**A. Co-defendant Marquise Ramyyeh left the vehicle, pointed a handgun at Victim C, took the equipment to the vehicle, and was sentenced to 116 months total** ........ 4

**B. Co-defendant Chaqwon Birden left the vehicle, pointed a rifle at Victims B and C, and took the equipment to the vehicle** ........ 5

**C. Co-defendant Jahjuan Green left the vehicle and pointed a handgun at Victim A** ........ 6

**IV. § 3553(a)(1): KAHDAFFIE'S PERSONAL HISTORY AND CHARACTERISTICS WARRANT A BELOW-GUIDELINES SENTENCE** ........ 8

**A. Kahdaffie's childhood was generally positive but suffered from a lack of financial security and community violence** ........ 8

**B. Kahdaffie's past substance use negatively impacted his decision-making** ........ 11

**C. Kahdaffie's daughter and mother rely on him and will be especially impacted by his sentence** ........ 13

**D. Kahdaffie's self-improvement and heroism while in pretrial custody** ........ 15

**V. § 3553(a)(2): OTHER STATUTORY FACTORS SUPPORT A BELOW-GUIDELINES SENTENCE** ....................17

**A. § 3553(a)(2)(A)–(B): Count 3's 84-month mandatory minimum already represents a significant ramping up of punishment that substantially reflects the seriousness of the offense, promotes respect for the rule of law, and affords adequate deterrence** .................... 17

**B. § 3553(a)(2)(C): Kahdaffie's proposed sentence will protect the public from further crimes** ....................18

**C. § 3553(a)(2)(D): A below-guideline sentence would help Kahdaffie pursue his potential** .................... 23

**VI. A SENTENCE OF 6 MONTHS PLUS 84 MONTHS REFLECTS THE SERIOUSNESS OF THE OFFENSES, IS A JUST PUNISHMENT, IS A SUFFICIENT DETERRENCE, AND CONSIDERS THE PROTECTION OF THE PUBLIC AND REHABILITATION** ....................23

**VII. CONCLUSION** .................... 25

## TABLE OF AUTHORITIES

### CASES

*Gall v. United States*, 552 U.S. 38 (2007) ....................1, 3, 8

*Koon v. United States*, 518 U.S. 81 (1996) .................... 8

*Pepper v. United States*, 562 U.S. 476 (2011) .................... 8

*Thompson v. Oklahoma*, 487 U.S. 815 (1988) ....................2

*United States v. Booker*, 543 U.S. 220 (2005) .................... 1

*United States v. Harris*, 383 F. App'x 551 (7th Cir. 2010) .................... 2, 3

*United States v. Moore*, 50 F.4th 597 (7th Cir. 2022) .................... 3

*United States v. Patel*, 921 F.3d 663 (7th Cir. 2019) ....................4, 5, 6

*United States v. Pilon*, 734 F.3d 649 (7th Cir. 2013) .................... 24

*United States v. Presley*, 790 F.3d 699 (7th Cir. 2015) .................... 22, 25

*United States v. Robles*, 828 F. Supp. 2d 626 (S.D.N.Y. 2011) ....................25

*United States v. Solomon*, 892 F.3d 273 (7th Cir. 2018) ....................3, 6, 7, 23

*United States v. Statham*, 581 F.3d 548 (7th Cir. 2009) ....................3, 4, 5, 6

### STATUTES

18 U.S.C. § 924(c)(1)(A)(ii) .................... 1, 18

18 U.S.C. § 1951(a) .................... 1

18 U.S.C § 3553 .................... *passim*

U.S. SENTENCING GUIDELINES MANUAL §§ 2B3.1(b)(2) (U.S. SENTENCING COMM'N 2025) .................... 18

U.S. SENTENCING GUIDELINES MANUAL § 2K2.4(b) (U.S. SENTENCING COMM'N 2025) .................... 1, 18

### OTHER AUTHORITIES

Alan Mozes, *Gunshot Survivors May Struggle with Emotional Aftermath for Years,*

HEALTHDAY (Nov. 20, 2019) .......... 11

Amanda M. Bunting et al., *Beyond the Employment Dichotomy: An Examination of Recidivism and Days Remaining in the Community by Post-Release Employment Status*, 63 J. INT'L J. OFFENDER THERAPY & COMPARATIVE CRIMINOLOGY 712 (2018) .......... 20, 21

Heidi Zinzow et al., *Losing a Loved One to Homicide: Prevalence and Mental Health Correlates in a National Sample of Young Adults*, 22 J. TRAUMATIC STRESS 20 (2009) .......... 11, 12

U.S. SENTENCING COMM'N, MANDATORY MINIMUM PENALTIES FOR FEDERAL FIREARMS OFFENSES (2018) .......... 17

U.S. SENTENCING COMM'N, REPORT TO THE CONGRESS: MANDATORY MINIMUM PENALTIES IN THE FEDERAL CRIMINAL JUSTICE SYSTEM (Oct. 2011) .......... 18

U.S. SENTENCING COMM'N, THE EFFECTS OF AGING ON RECIDIVISM AMONG FEDERAL OFFENDERS (Dec. 2017) .......... 22

VALERIE WRIGHT, DETERRENCE IN CRIMINAL JUSTICE: EVALUATING CERTAINTY VS. SEVERITY OF PUNISHMENT (2010) .......... 23, 24

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant Kahdaffie Green, by his attorneys Bedi & Singer, LLP, respectfully requests, pursuant to 18 U.S.C § 3553(a) and *United States v. Booker*, 543 U.S. 220 (2005) and its progeny, that this Court impose a sentence of 6 months on Count 2 and 84 months on Count 3, to run consecutively for a total sentence of 90 months and followed by a term of supervised release. In support of this request, Kahdaffie states as follows:

## I. OVERVIEW OF SENTENCING REQUEST AND GUIDELINE CALCULATION

Kahdaffie Green is a father to his eight-year-old daughter Kezayah, a former football team captain who graduated from high school with a 3.6 GPA, and a survivor of a shooting that left a bullet still lodged in his back. He has admitted his role in the offense and taken full responsibility. Kahdaffie has pled guilty to robbery, in violation of 18 U.S.C. § 1951(a) (Count 2), and to brandishing a firearm in connection with a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Count 3). The base offense level for Count 2 is 20. Kahdaffie's criminal history score of 11 provides a criminal history category of V. Therefore, his guideline range is 51–63 months, and the statutory maximum is 20 years. 18 U.S.C. § 1951(a). Count 3 carries a statutory mandatory minimum sentence of 84 months and a maximum of life imprisonment. 18 U.S.C. § 924(c)(1)(A)(ii). Therefore, the guideline for Count 3 is 84 months, as required by U.S. Sentencing Guidelines Manual ("USSG") § 2K2.4(b).

Kahdaffie Green respectfully requests, pursuant to 18 U.S.C § 3553(a) and *Gall v. United States*, 552 U.S. 38 (2007), that this Court impose a sentence of 6 months on Count 2 and 84 months on Count 3, for an aggregate sentence of 90 months. That sentence is "sufficient but not greater than necessary" to comply with the purposes of sentencing articulated in 18 U.S.C § 3553(a). It reflects the seriousness of the offense while also taking into account Kahdaffie's

role in the offense, his desire and capacity for rehabilitation, his personal history and characteristics, and the other statutory factors. A sentence within the advisory guidelines would be far greater than necessary in view of these factors. As the probation office recommends, the Court also should waive financial penalties because Kahdaffie is indigent, and no restitution is outstanding.

## II. THE NATURE AND CIRCUMSTANCES OF THE OFFENSES IN VIEW OF KAHDAFFIE'S CO-DEFENDANTS JUSTIFY A SENTENCE OF 90 MONTHS

On December 6, 2023, Kahdaffie drove his co-defendants to a site where workers were installing a natural gas pipeline using expensive equipment. (PSR ¶ 9; Gov't Version of the Offense at 1.) While his co-defendants left the vehicle with firearms and stole some of the equipment, Kahdaffie remained in the vehicle and then drove away with his co-defendants once they had loaded the stolen items into the vehicle. (PSR ¶¶ 10–11.) Kahdaffie and his co-defendants were apprehended later that day. (*Id.* ¶¶ 11–12.)

Kahdaffie admits his involvement in the criminal conduct, and the seriousness of that conduct. Yet unlike his co-defendants, Defendant did not himself possess or brandish or use a firearm during the conduct and did not directly engage with any of the victims or with the stolen property. (*See* Gov't Version of Offense at 6–8 (describing weapons recovered and associated with Kahdaffie's co-defendants). So while Kahdaffie's actions enabled his co-defendants' more violent conduct—and he accordingly pleads guilty to being liable for that conduct—Kahdaffie himself did not carry out the most dangerous conduct. The Court should consider Kahdaffie's lesser involvement in the core criminal conduct here as a mitigating sentencing factor. *See Thompson v. Oklahoma*, 487 U.S. 815, 872 (1988) ("[T]here is broad agreement within our society, namely, that punishment should be directly related to the personal culpability of the criminal defendant[.]") (Scalia, J., dissenting) (internal quotations omitted); *United States v.*

*Harris*, 383 F. App'x 551, 553 (7th Cir. 2010) (affirming the district court who considered in "mitigation Harris's lesser culpability in relation to his codefendants by giving him a below-guidelines sentence").

Accordingly, Kahdaffie never brandished a firearm or threatened any victim—in fact, he never left the vehicle or possessed a gun at all during the robbery. By contrast, each of Kahdaffie's co-defendants got out of the vehicle wearing a ski mask and pointed a gun at the victims, thus directly putting them in mortal danger. For sentencing purposes, the Court should not hold Kahdaffie as culpable as his co-defendants for conduct that he did not himself carry out, even as Kahdaffie admits his involvement and accepts liability for it. This alone justifies a below-guidelines sentence.

## III. § 3553(a)(6): THE COURT MUST AVOID UNWARRANTED SENTENCING DISPARITIES AMONG DEFENDANTS

Under 18 U.S.C. § 3553(a)(6), the Court is obliged to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See also Gall v. United States*, 552 U.S. 38, 54 (2007) (quoting § 3553(a)(6)). This "encompasses potential disparities not only across judges and districts but also between co-defendants." *United States v. Moore*, 50 F.4th 597, 603 (7th Cir. 2022). The Court therefore must consider the role of each participant in the offenses here to avoid unwarranted sentencing disparities. In determining Kahdaffie's sentence, the Court must consider his role in comparison to those of his other co-defendants to avoid such disparities. In doing so, "the guidelines are not a straitjacket," and the Court "is entitled, if it wishes, to apply the rule against unwarranted disparities to co-defendants' sentences." *United States v. Solomon*, 892 F.3d 273, 278 (7th Cir. 2018); *United States v. Statham*, 581 F.3d 548, 556 (7th Cir. 2009) ("We are [] open in all cases to an argument that a defendant's sentence is unreasonable because of a

disparity with the sentence of a co-defendant[.]"). Co-defendants Marquise Ramyyeh, Chaqwon Birden, and Jahjuan Green were all involved in this offense and engaged in more dangerous conduct than Kahdaffie that directly put lives at risk; Kahdaffie therefore should receive a sentence well below those of his co-defendants.

Kahdaffie is the only defendant who did not get out of the vehicle or point a gun at someone, and unlike Ramyyeh and Birden he did not physically pick up the equipment that was subject of the robbery. Any disparity in Kahdaffie's criminal history compared to others' is dwarfed by the "several major differences" in their relative involvement and culpability for the criminal conduct and "warrants a disparity between their respective sentence" in Kahdaffie's favor. *United States v. Patel*, 921 F.3d 663, 673 (7th Cir. 2019); *see also Statham*, 581 F.3d at 556 ("[T]he different members of the conspiracy were not similarly situated; there is thus nothing unreasonable about the fact that the sentences they received were also different."). Kahdaffie's proposed below-guidelines sentence reflects the reality that he is far less culpable than his co-defendants for the robbery here and thus should receive the lowest sentence of the group.

### A. Co-defendant Marquise Ramyyeh left the vehicle, pointed a handgun at Victim C, took the equipment to the vehicle, and was sentenced to 116 months total

Ramyyeh pled guilty to the same counts as Kahdaffie and the Court sentenced him to 32 months for Count 2 and a mandatory 84 months for Count 3, for a total of 116 months, plus three years of supervised release. (Dkt. 163.) Ramyyeh's conduct during the robbery was much more dangerous than Kahdaffie's even as they have pled guilty to the same counts: Ramyyeh took a firearm and pointed at one of the victims to carry out the robbery and physically carried away the stolen equipment and placed it in the vehicle. (Gov't Version of the Offense at 3–4.) Accordingly, and notwithstanding Kahdaffie's higher criminal offense category, Kahdaffie's sentence should be significantly less than Ramyyeh's.

When the co-defendants arrived at the worksite on December 6, 2023, Ramyyeh exited the vehicle with a ski mask on and then pointed a handgun at both Victim B and Victim C. (*Id.* at 3.) Then, Ramyyeh together with Birden took the worksite equipment and loaded them into the vehicle. (*Id.* at 3–4.) His fingerprints were later recovered from the magazine of a loaded 9mm Glock pistol. (*Id.* at 8.) Kahdaffie took none of those actions—he remained in the vehicle for the entirety of the offense, did not brandish a weapon or threaten anyone, did not take and load the stolen equipment into the vehicle, and lab analysis did not tie him to any of the weapons recovered during the investigation. These amount to "several major differences" between Kahdaffie's and Ramyyeh's conduct "that warrants a disparity between their respective sentences." *Patel*, 921 F.3d 663, 673; *see also Statham*, 581 F.3d at 556 ("[T]he different members of the conspiracy were not similarly situated; there is thus nothing unreasonable about the fact that the sentences they received were also different.").

Therefore, though Counts 2 and 3 ultimately apply to both defendants, Ramyyeh's culpability far exceeds Kahdaffie's, notwithstanding that Ramyyeh's criminal history category technically is less than Kahdaffie's. A total sentence for Kahdaffie of 90 months is proper relative to Ramyyeh's 116-month sentence, given that Ramyyeh left the vehicle, pointed a gun at victims, and physically took the stolen equipment while Kahdaffie did none of those things.

**B. Co-defendant Chaqwon Birden left the vehicle, pointed a rifle at Victims B and C, and took the equipment to the vehicle**

Like Kahdaffie, Birden pled guilty to Counts 2 and 3, and his sentencing is set for August 6, 2026. But like Ramyyeh and unlike Kahdaffie, Birden left the vehicle with a rifle, pointed that rifle at each Victim B and Victim C, and then stole the equipment and put it in the vehicle. (Gov't Version of the Offense at 3–4.)

Upon arriving at the worksite with the other co-defendants, Birden got out of the vehicle with a ski mask on and pointed a rifle at Victim B's face. (*Id.* at 3.) When Victim C, who had been using a directional drill, stood up and turned, Birden then pointed his rifle at him too. (*Id.*) He and Ramyyeh then stole equipment from the worksite and put it in the vehicle before all defendants got back in the vehicle and drove away. (*Id.* at 3–4.) Law enforcement later recovered the loaded Smith & Wesson rifle and analyzed fingerprints on the rifle as being possessed by Birden. (*Id.* at 7.)

During this entire sequence, Kahdaffie remained in the vehicle, brandished no firearm and confronted no victim, and personally took nothing at the site. Therefore, though Kahdaffie facilitated the overall crime as the driver and has pled guilty to the same counts as Birden and Ramyyeh, Kahdaffie's involvement in the crime was far less dangerous. He at no point possessed a gun (no lab analysis suggested he had handled any of the recovered weapons), much less pointed it at multiple victims like Birden did. Accordingly, and although Birden has not yet been sentenced, the sentence the Court imposes on Kahdaffie should be lower than that it ultimately imposes on Birden. *See Solomon*, 892 F.3d at 279 (rejecting a flat view "that a sentence cannot become substantively unreasonable based upon a co-defendant's later sentence," particularly where "the district court was handling both cases simultaneously" and "had enough information available to it at [defendant's] sentencing hearing to compare his and [his co-defendant's] culpability"). A 90-month, below-guidelines sentence for Kahdaffie helps guarantee that his relative sentence matches his relative culpability for the crimes to which he, Birden, and Ramyyeh have all pled guilty. *See Patel*, 921 F.3d at 673; *Statham*, 581 F.3d at 556.

### C. Co-defendant Jahjuan Green left the vehicle and pointed a handgun at Victim A

Kahdaffie's brother Jahjuan Green likewise took more dangerous action than did

Kahdaffie and should receive a higher sentence than him. Like everyone but Kahdaffie, Jahjuan Green exited the vehicle with a ski mask on when the group arrived at the worksite. (Gov't Version of the Offense at 3.) He then pointed a handgun at Victim A's face and continued to brandish the weapon while Ramyyeh and Birden took equipment from the site and loaded it into the vehicle. (*Id.* at 3–4.) Jahjuan Green, along with Ramyyeh and Birden, thus placed Victims A, B, and C in severe physical danger and committed conduct for which they and Kahdaffie may ultimately be liable.[1] In addition to the Glock pistol tied to Ramyyeh and the Smith & Wesson rifle tied to Birden, the police recovered from the vehicle a Glock Model 30 Gen 4 pistol which matches the description of the pistol Jahjuan Green used during the robbery. No other weapons were recovered, which confirms that Kahdaffie did not himself possess or use a firearm during the robbery and therefore did not have the same ability to inflict harm on any of the victims as did Jahjuan Green and Kahdaffie's other co-defendants.

Though the co-defendants' charges and convictions may be the same, Kahdaffie's culpability is far lower. While Jahjuan Green got out of the vehicle, pointed a gun at one victim, and provided armed cover while Ramyyeh and Birden loaded up the stolen equipment, Kahdaffie stayed in the vehicle without a weapon. Kahdaffie's culpability for the robbery and firearms offenses for which both he and Jahjuan Green were charged thus is lower and should be reflected in sentencing. Though Jahjuan Green has not yet pled guilty and no presentence investigation report has been prepared for him, the Court should expect that should he plead guilty, Jahjuan Green's sentence will be higher than Kahdaffie's sentence in light of their relative culpability and sentence Kahdaffie to a below-guidelines sentence accordingly. *See Solomon*, 892 F.3d at 279 (rejecting a flat view "that a sentence cannot become substantively unreasonable based upon a

[1] As of this writing, Jahjuan Green has not yet formally pled guilty, though a change-of-plea hearing is scheduled for July 16, 2026. (Dkt. 172.)

co-defendant's later sentence," particularly where "the district court was handling both cases simultaneously" and "had enough information available to it at [defendant's] sentencing hearing to compare his and [his co-defendant's] culpability").

## IV. § 3553(a)(1): KAHDAFFIE'S PERSONAL HISTORY AND CHARACTERISTICS WARRANT A BELOW-GUIDELINES SENTENCE

The United States Supreme Court has determined a defendant's history and characteristics are "clearly relevant to the selection of an appropriate sentence," and each sentence must "fit the offender and not merely the crime." *Pepper v. United States,* 562 U.S. 476, 488, 492 (2011). The sentencing court must "make an individualized assessment based on the facts presented." *Gall v. United States,* 552 U.S. 38, 50 (2007); *Koon v. United States,* 518 U.S. 81, 113 (1996) (The sentencing judge "consider[s] every convicted person an individual and every case as a unique study in the human failing that sometimes mitigate, sometimes magnify, the crime and punishment to ensue."). In considering all the §3553(a) factors, this Court will gain a fuller and clearer picture of Kahdaffie, showing a sentence of 90 months is appropriate. As the probation office acknowledges, Kahdaffie's upbringing, prior trauma, and future potential warrant a sentence below the advisory guideline range. (PSR, Sentencing Recommendation at 2.)

### A. Kahdaffie's childhood was generally positive but suffered from a lack of financial security and community violence

Kahdaffie was born on December 16, 1998, in Chicago, to Jennie McNeal and Maurice Green. (PSR ¶ 65.) His parents never married but remained in a relationship in his early years. (*Id.*) Following their separation, Kahdaffie continued to see his dad, who reportedly was "'on the streets' drinking alcohol and gambling," a few times per year but lately has increased his contact with his father. (*Id.*) Kahdaffie has several full and half siblings in the Chicago area. (*Id.* ¶ 66.)

As he grew older, Kahdaffie continued living with his mom and full siblings, including his co-defendant Jahjuan Green. (*Id.* ¶ 67.) For most of Kahdaffie's school years, the family lived

with Kahdaffie's grandmother, Glenda McNeal, who still resides in Chicago and with whom Kahdaffie remains close. (*Id.*) When Kahdaffie was around 12 years old, his mom began a relationship with Louis Cook, who would become Kahdaffie's stepdad and has been a father figure to Kahdaffie. (*Id.* ¶ 68.) Kahdaffie's mom is a manager at Wal-Mart, and his stepdad works at the Salvation Army, where Kahdaffie also has volunteered and plans to volunteer again after release. (*Id.* ¶¶ 65, 68.) Throughout his life, Kahdaffie also has been supported by his paternal family, including his grandmother, aunts, and uncles. (*Id.* ¶ 67.)

Kahdaffie's childhood was generally happy. (*Id.* ¶ 69.) He had birthday parties, got along with his family, and helped with household chores. (*Id.*) Growing up, Kahdaffie especially loved sports—he played football throughout high school and played basketball and other sports. (*Id.* ¶¶ 69–70; *see also* Exs. 1–2 (news article and photograph of Kahdaffie).) Kahdaffie was captain of the football team, his mom and stepdad attended every game. (*See id.* ¶ 94.) He graduated from Wendell Phillips High School in 2017 with an impressive 3.6 GPA. (*Id.*)

Still, Kahdaffie's mother struggled financially, and the family lived in a rough neighborhood in Englewood.[2] (*Id.* ¶ 71.) Kahdaffie therefore was no stranger to the violence in his community, as Englewood was fraught with violence and gangs.[3] Even though Kahdaffie did

---

[2] A 2012 *New York Times* article detailed the lives of the Sewell family, who lived in the Englewood neighborhood since 2005. "Even on the sunniest afternoons, the family is on lockdown. No place in the struggling South Side neighborhood feels safe to the family these days. In the last few weeks there have been at least two outbreaks of gunfire on their block of two-flats and bungalows . . . 'There's no escape,' [Ms. Gray-Sewell] said. 'Living in Englewood, I feel like I'm robbing my children of their childhood.'" Don Terry, *In South Side Neighborhood, Violence Still Hard to Shake,* New York Times (Feb. 4, 2012) https://www.nytimes.com/2012/02/05/us/in-chicago-neighborhood-of-englewood-violence-hard-to-shake.html

[3] Research supports this characterization. Englewood is consistently the neighborhood with the most murders in Chicago. Natalie Moore, *Chicago's highest murder rate in Englewood,* WBEZ Chicago (Jan. 5, 2012) https://www.wbez.org/stories/chicagos-highest-murder-rate-in-englewood/40131fd0-3876-47cd-af3d-613bfc5d47fb. Englewood's poverty rate also is double that of Chicago as a whole. Chicago Health Atlas, *Englewood* (2020 census data), https://chicagohealthatlas.org/neighborhood/1714000-68?tab=data. In 2011, murders had decreased approximately 2% citywide, however, in Englewood, murders were up about 40%. Frank Main, *City sees drop in murder rate, but not in South Side's Englewood,* Chicago Sun-Times (Dec. 30, 2011),

not himself take up with that culture during his childhood, Kahdaffie witnessed many friends and others getting shot in the neighborhood, and Kahdaffie and his brothers also were jumped when using public transportation to get to and from school. (*Id.*)

Kahdaffie was offered multiple football scholarships due to his success in high school and at one time planned to attend Texas State University on one of those scholarships, but could not attend college because his daughter Kezayah was born, it was increasingly difficult to cope with the loss and violence he continued to experience, and because of financial issues. (*See id.* ¶ 72.) He continued to struggle with the ramifications of the violence he encountered as he entered adulthood and therefore resorted to alcohol and drug use instead, even as he also tried to be a father to Kezayah. (*Id.*)

For example, one of his best friends, Jamal Harrington, was killed in 2017. Then, just a few months later, Kahdaffie and another close friend, Jamal Brown, were on the wrong street in Englewood at the wrong time. A nearby drive-by shooting targeted somebody else, a stray bullet hit Brown, and Kahdaffie had to watch as one of his best friends—whom Kahdaffie had grown up with and seen every day—died in front of him. Those tragedies, and the others that Kahdaffie witnessed or knew of, had a profound psychological impact—he felt incredible loss from having seen a childhood friend every day to watching him die and his presence gone forever. Kahdaffie became even more scared of becoming a victim of gun violence himself—a fear that was realized in September 2023.

Kahdaffie was in Englewood driving to his grandmother's house when he was hit by multiple stray bullets that had ricocheted off another car. (*See id.* ¶¶ 71, 82.) One of those bullets remains lodged in his back and still causes him pain, and doctors told Kahdaffie that he would

---

https://chicago.suntimes.com/news/2011/12/30/18531718/city-sees-drop-in-murder-rate-but-not-in-south-side-s-englewood.

have been paralyzed if the bullet had been 2 centimeters to the left. (*See id.* ¶ 82.) Though Kahdaffie has since been able to mitigate the pain by staying physically active and working out, his experience as a gun-violence victim at the time caused him to turn to drugs even more to deal with the physical and emotional pain, especially after seeing his daughter and mother break down and cry upon seeing him in the hospital shortly after the shooting. These cumulative experiences had a significant impact on Kahdaffie both physically and mentally, made him feel empty, and were a strong factor in continuing to divert him toward drugs, alcohol, and criminal activity. (*Id.* ¶¶ 72, 89–91.) Though Kahdaffie was not drawn to the streets or a criminal lifestyle during his childhood and adolescence, he ultimately lost his way as a result of his mounting trauma and his fateful decision to turn to drugs and alcohol to cope with that trauma, which eventually led to him perpetuating criminal conduct himself even as he understood first-hand the pain that violence causes victims and their loved ones.

**B. Kahdaffie's past substance use negatively impacted his decision-making**

Kahdaffie has some history of substance use, which offered him a way to block out the world and especially the trauma he had experienced after losing close friends to gun violence, but ultimately messed with his head, hampered his relationships, and took him down a path that culminated in increased drug use and criminal activity. (*Id.* ¶¶ 72, 89–91.) *See* Alan Mozes, *Gunshot Survivors May Struggle with Emotional Aftermath for Years*, HEALTHDAY (Nov. 20, 2019),[4] ("The investigators found that drug and alcohol use shot up by more than 13% post-shooting . . . Moreover, they determined that 49% of survivors were probably struggling with PTSD."). This is common for those who lose close friends and other loved ones to criminal homicide. *See* Heidi Zinzow et al., *Losing a Loved One to Homicide: Prevalence and Mental*

[4] Available at https://medicalxpress.com/news/2019-11-gunshot-survivors-struggle-emotional-aftermath.html

*Health Correlates in a National Sample of Young Adults*, 22 J. TRAUMATIC STRESS 20, 20–27 (2009).[5] "Homicide survivors" like Kahdaffie "are found to have higher prevalence rates of PTSD in comparison to direct crime victims and in comparison to parents who have lost loved ones to suicide or accidents." *Id.* And "studies have demonstrated that trauma-exposed individuals are at risk for substance use disorders." *Id.* Accordingly, researchers have "found higher prevalence of drug use in homicide survivors, given research suggesting relations among trauma exposure, PTSD, and substance use." *Id.* Kahdaffie's exposure to violence in his neighborhood and its consequences interfered with his progress, including by causing him not to pursue college after completing high school with a high GPA. (PSR ¶ 72.)

By turning to drugs and alcohol to cope with his trauma, Kahdaffie put himself on a path where substance use increased and he started engaging in criminal activity. Though football and other sports had been a strong positive outlet for Kahdaffie to deal with the violence in his community, they were not enough when he started losing a lot of friends to gun violence in his freshman year of high school. To deal with the increasing emotional struggles at that time, Kahdaffie increased his substance use—he began consuming alcohol that year, and throughout high school increased his intake of alcohol and turned to marijuana and ecstasy. (PSR ¶ 89.) This trend only became worse after high school, with Kahdaffie continuing to see friends die from gun violence, including his best friend in 2022, and accordingly ramping up his alcohol and drug use, including also taking Xanax and Percocet. (*Id.* at ¶¶ 71, 89.)

This trend of increasing drug use directly overlaps with Kahdaffie's criminal history. Kahdaffie had no juvenile criminal history whatsoever. (*Id.* ¶ 46.) But after graduating high school, having two of his best friends die in 2017 (including himself watching one of those friends die) and ramping up his alcohol and drug use as a result, Kahdaffie started amassing a

[5] Available at https://pmc.ncbi.nlm.nih.gov/articles/PMC2829865/.

criminal record in late 2017 and now finds himself facing a serious prison sentence because of the choices he made after turning to drugs and crime to deal with his trauma.

### C. Kahdaffie's daughter and mother rely on him and will be especially impacted by his sentence

Kahdaffie has an eight-year-old daughter, Kezayah, from a prior relationship. (*Id.* ¶ 75.) Kahdaffie and his mom have been the primary caregivers for Kezayah for years, after Kezayah's own mother was investigated for neglect and did not allow Kezayah to attend a single day of school for an entire year. (*Id.* ¶ 76.). Thanks to the change in Kezayah's custody, Kezayah now lives with Kahdaffie's mom, is doing much better, and is an honor roll student. (*Id.* ¶¶ 75–76.) Of course, Kezayeh still "is sad and misses her father," especially given the trauma she already has experienced in her childhood, including seeing Kahdaffie in the hospital after he was hit by a stray bullet. (*See id.* ¶ 77.) Before his arrest, Kahdaffie was heavily involved in Kezayeh's life and especially loved taking her to the zoo, doing coloring books, and playing games with her, and he looks forward to continuing to raise her as soon as he is released. (*Id.* ¶ 75.) But with Kahdaffie now locked up, the responsibility for raising Kezayah falls almost entirely on his mom, who has temporary custody of Kezayah but feels the difficulties of raising her granddaughter without Kahdaffie's help until he is released and can take over caretaking responsibilities. (*See id.* ¶¶ 76–77.) Kahdaffie has tried to be the best father he can be from jail, including by completing a multi-week parenting program, but this is no substitute for being with Kezayah at home every day. (*See* Ex. 3.)

The 84-month mandatory minimum for Count 3 guarantees that Kezayah will at least be well into her teen years, likely having continued to be raised primarily by Kahdaffie's mother, by the time he is released. Notwithstanding whatever contact Kahdaffie may be able to have with Kezayah while he is incarcerated, Kezayah will benefit immensely from any time she can have

with Kahdaffie as an at-home parent during what remains of her childhood. A guideline sentence, or even a slight downward departure, would all but prevent her from having her father as a meaningful caregiver in her youth and may prevent Kahdaffie from having a close relationship with her for the rest of his life. By contrast, Kahdaffie's proposed 90-month sentence would allow him to be there for Kezayah and foster a relationship with her as she enters young adulthood. He will take the childrearing load off his own mother, celebrate Kezayah's academic, athletic, and other successes just as his own mom and stepdad did when Kahdaffie was younger, and help her learn from his own mistakes so she can avoid making them herself. Kahdaffie's proposed sentence thus helps guarantee not only that Kahdaffie can succeed but that Kezayah can too.

An earlier release will also be an enormous help to Kahdaffie's mom Jennie, who is raising Kahdaffie's daughter by herself while he is locked up, which has been a difficult, even if rewarding, undertaking. (PSR ¶ 77.) Jennie also struggles with her son being incarcerated, is "depressed," and blames herself for his criminal behavior. (*Id.*) She knows Kahdaffie "as a loving, hard-working, loyal and dedicated person who 'strives for greatness,'" who lost his way due to "drug use, spending time with the wrong people, and poor decision making" and did not get the help he needed. (*Id.*) Kahdaffie takes full ownership over his criminal conduct, and wants to move back with his family which has been such a positive influence on his life so he can contribute positively by raising his daughter, working, volunteering at the Salvation Army with his stepdad, and being an everyday presence rather than an occasional phone call or prison visit. A lesser sentence allows Kahdaffie to take over for Jennie as Kezayah's primary caregiver and to help heal the other family wounds inflicted by Kahdaffie's own prior actions and his resulting incarceration.

**D. Kahdaffie's self-improvement and heroism while in pretrial custody**

While in pretrial custody, Kahdaffie has sought out programming to address his past behaviors and substance use and turn his life around. (*Id.* ¶¶ 86–87; Exs. 3–4.) Last year, he explained to BOP staff his "hopes to learn things to keep him 'on the straight path'" and his "desire to change the people he surrounds himself with." (Ex. 5.) By all accounts, Kahdaffie has done this. Rather than simply biding his time until release, he has thrown himself into self-improvement so his past conduct and mindset do not define his future, and he is prepared to be there for his daughter, his family, and his community when he is released. Kahdaffie has found the classes he has taken while in custody have helped him develop coping strategies and pursue a new direction in life, and hopes to take more classes and substance abuse treatment to continue that progress. (PSR ¶¶ 86–87) The BOP Psychology Services agrees that Kahdaffie has made significant progress both regarding his past substance abuse and overall. (Ex. 6.) Green has acknowledged how his past substance use has affected himself and his home life: "I missed a lot of good opportunities to succeed, struggle with depression, and had bad judgment." (*Id.*) He also recognizes that he has "led a disordered lifestyle that has had a negative impact on many aspects of my life." (*Id.*) Accordingly, he has sought to address errors in his thinking and behavior, including leading "a drug-free lifestyle, utilizing healthy coping mechanisms to manage unpleasant emotions and difficult situations," and removing himself "from being around negative influences (i.e. people/situations)." (*Id.*) Kahdaffie and the BOP Psychology Services have recognized his progress in these areas. His counselor reports that he has not only completed BOP programming but has been "reading different books on coping, and started working out regularly"—accordingly, his "thinking has improved" and "he improved his capacity for a deeper understanding of his patterns of thinking as well as his emotions and behaviors." (*Id.*) As yet another major milestone in setting himself up for success, Kahdaffie has reoriented his social

relationship away from negative influences and toward his family. He has "cut a lot of people off and it has helped my mental state" and "really want[s] to continue to stay away from negative energy and negative people," so he now removes himself when he hears people "talking about criminal thinking or negative things." (*Id.*) He has been "coping better with the new tools he has gained" and is well on his way to being ready for a productive lifestyle upon release that avoids the negative lifestyle and thinking that led to his criminal conduct in the past. (*Id.*)

As a testament to Kahdaffie's character and growth, he was recently recognized by the BOP for a "significant and commendable act of heroism." (Ex. 7 at 2.) On April 10, 2026, another inmate tried to jump from the top tier of the MCC unit in an apparent suicide attempt. (*Id.*) Kahdaffie and others prevented this, with Kahdaffie "positioning himself to ensure the individual did not proceed with the jump and initiating efforts to de-escalate the situation." (*Id.*) He and the others pulled the individual back to safety and therefore "directly prevented a potentially fatal outcome." (*Id.*) Kahdaffie's conduct shows how he has turned a corner in his rehabilitation, as it "reflects exceptional awareness, coordinated response, and a clear regard for the preservation of human life under urgent and high-risk circumstances." (*Id.*) His heroism demonstrates that his efforts to improve himself and become a positive influence on those around him are working. Whereas the past conduct underlying his criminal case was serious and put others in danger, Kahdaffie today is not only doing everything he can to improve himself but is actively helping save lives. Kahdaffie already is not the same man he was in December 2023, and a 90-month sentence will be more than enough to ensure that he returns to free society as a positive force who supports his family, raises his daughter, improves his community, and avoids criminal conduct.

## V. § 3553(a)(2): OTHER STATUTORY FACTORS SUPPORT A BELOW-GUIDELINES SENTENCE

In addition to the statutory factors explained above, others support a below-guidelines sentence for Kahdaffie. Specifically, a 90-month cumulative sentence reflects the seriousness of the offense, promotes respect for the rule of law, affords adequate deterrence, protects the public from further crimes, and will allow Kahdaffie to re-engage as a helpful member of society and pursue his potential.

### A. § 3553(a)(2)(A)–(B): Count 3's 84-month mandatory minimum already represents a significant ramping up of punishment that substantially reflects the seriousness of the offense, promotes respect for the rule of law, and affords adequate deterrence

As the probation office acknowledges, the sentence Kahdaffie now faces is far greater than any sentence he previously served and a below-guideline sentence is sufficient to reflect the seriousness of the offense, propose respect for the rule of law, and afford adequate deterrence. (PSR, Sentencing Recommendation at 3.) *See* 18 U.S.C. § 3553(a). Kahdaffie now faces a mandatory minimum sentence on Count 3 that is double any of his prior sentences. So while Kahdaffie has been convicted of prior offenses, as reflected in his criminal history, the mandatory minimum plus a guideline range would subject him to a sentence that would go far beyond what is necessary. *See* U.S. SENTENCING COMM'N, MANDATORY MINIMUM PENALTIES FOR FEDERAL FIREARMS OFFENSES 62 (2018)[6] ("[F]irearms mandatory minimum penalties continue to have a significant impact on the sentencing of firearms offenders.").

Notably, had the use of weapons in the robbery here been considered as a 6-level sentencing enhancement rather than a separate offense with a mandatory consecutive sentence, Kahdaffie's offense level would have been 24 rather than 18, and would have yielded a guideline

[6] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2018/20180315_Firearms-Mand-Min.pdf.

range of 92–115 months. *See* USSG §§ 2B3.1(b)(2) and 2K2.4, Application Note 4. "Because the guideline enhancements operate through offense levels rather than prescribing particular lengths of imprisonment, the amount of the increase based on weapon involvement changes in proportion to the seriousness of the offense and the characteristics of the offender." U.S. SENTENCING COMM'N, REPORT TO THE CONGRESS: MANDATORY MINIMUM PENALTIES IN THE FEDERAL CRIMINAL JUSTICE SYSTEM 358 (Oct. 2011).[7] Kahdaffie submits that this represents a more reasonable range for his cumulative sentence that still reflects a serious punishment and deterrent for his conduct, in addition to Kahdaffie's other mitigating factors. *See id.* at 360–61 ("The Judicial Conference of the United States has historically opposed mandatory minimum penalties . . . [and] has urged Congress on at least two occasions to amend the 'draconian' policies established at section 924(c)."). Moreover, imposing a substantial period on top of the mandatory minimum would perpetuate the racial disparities in sentencing that especially fall on Black offenders like Kahdaffie. *Id.* at 363 ("[T]o the extent the mandatory minimum penalties for firearm offenses are unduly severe, these effects fall on Black offenders to a greater degree than on offenders in other racial groups.").

### B. § 3553(a)(2)(C): Kahdaffie's proposed sentence will protect the public from further crimes

Kahdaffie is 27 years old, and by the time he is released will be well into his mid-30s under even the shortest possible sentence. Therefore, to the extent the Court believes that Kahdaffie may be inclined to commit similar robberies or other crimes in his current environment and stage of his life that may put the public at risk, Kahdaffie will have moved into a new stage of his life in the several years he will be incarcerated. Requiring Kahdaffie to remain incarcerated into his late 30s or early 40s would not offer the public meaningful additional

[7] Available at https://www.ussc.gov/research/congressional-reports/2011-report-congress-mandatory-minimum-penalties-federal-criminal-justice-system

protection. Kahdaffie has already committed his time and efforts to rehabilitation and to putting himself on a path that honors himself and his loved ones. (PSR ¶ 87.) In the future, Kahdaffie hopes to continue his education, pursue a career in the trucking business, and perhaps even start his own clothing line—and has been reading books about starting a business so he can do so. (*See id.*) Following his incarceration, Kahdaffie plans to return to employment and volunteer activities, raise his daughter, develop his family relationships, and positively contribute to his community by helping others avoid making the same mistakes he made. (*Id.* ¶¶ 75, 98.) Kahdaffie is doing everything he can to be prepared for when he is released, and below-guidelines sentence will be more than enough to guarantee that the man who returns home to his family is not the same one who committed the crimes in this case—he has already committed to leaving that person behind, as exemplified by his heroic act of thwarting a recent suicide attempt by another inmate.

In addition to volunteering at the Salvation Army and as a youth football coach and mentor, he used to work at his aunt's restaurant and for his uncle's landscaping business and worked elsewhere prior to his arrest in this case, to which he can return as a future employee. (*Id.* ¶¶ 98–100.) As Kahdaffie has explained to his counsel, Kahdaffie's football coaches were mentors to him in his own youth and Kahdaffie himself loved volunteering as a football coach at Ogden Park for a football season because he wanted to show kids that they could succeed in both football and life even if they came from a tough neighborhood. He wants to again take on that role but with the additional layer of reflecting on his criminal past and helping his players achieve things in life that Kahdaffie could not or did not achieve after growing up in the same environment. The kids he has coached looked up to him, and he hopes to use his mentorship role to help them make better decisions and avoid the pitfalls of trauma, drugs, and crime that

Kahdaffie has experienced. He likewise hopes to volunteer at the Salvation Army as a motivational speaker to help others reflect on his experience and not fall into the same drug use and crime that he fell into. This volunteering can have a major positive impact on Kahdaffie but also on others, especially kids who are most susceptible to being caught up in a culture and environment of violence and drugs but also to being guided away from that lifestyle by Kahdaffie, who has experienced where that lifestyle leads and well positioned to help others avoid it. This situation and potential for a broad positive impact strongly supports a downward departure from a guideline sentence—the sooner Kahdaffie is released, the sooner he can contribute to his community, be a positive male role model to young people, and help them avoid making the same mistakes that he did. Research suggests that these work and volunteer plans decrease Kahdaffie's risk of recidivism, aside from the broader positive impact they can have on his community. (*Id.* ¶ 98.) *See* Amanda M. Bunting et al., *Beyond the Employment Dichotomy: An Examination of Recidivism and Days Remaining in the Community by Post-Release Employment Status*, 63 J. INT'L J. OFFENDER THERAPY & COMPARATIVE CRIMINOLOGY 712, 712–33 (2018)[8] (recognizing that "employment is expected to benefit individuals through a myriad of mechanisms" and emphasizing the importance of "job stability" over the number of hours worked to achieve those benefits).

Kahdaffie is in a long-term relationship with his girlfriend, who continues to support him as he navigates his case. (PSR ¶ 74.) Kahdaffie also has other strong supporters as he works to improve himself and the lives of others upon his release, as shown by the letters of support from his family and community members who recognize his positive attributes and achievements and can help ensure that he is not alone as he strives to better himself and be a positive influence on those around him. (*See* Exs. 8–11.) Shawn Parker, a child welfare specialist with Lutheran Child

[8] Available at https://pmc.ncbi.nlm.nih.gov/articles/PMC6387636/.

and Family Services of Illinois, has known Kahdaffie for twenty years and watched him transition from youth to adulthood. (Ex. 8.) He explains how Kahdaffie "has endured multiple traumatic events during his short 27 year life" but eventually had "taken to fatherhood in playing a major role in the life of his daughter" and has spoken "about attending trade schools to continue his education." (*Id.*) Marlon Hammond, who founded and runs the Restoring Englewood Action Plan (REAP) which is dedicated to breaking cycles of recidivism by helping current and former inmates reintegrate into society, writes about how Kahdaffie "is more than the circumstances that have brought him before the Court" and about Kahdaffie's "compassion, responsibility, and a strong sense of family duty." (Ex. 9.)

Those letters emphasize Kahdaffie's support for his family and desire to be a positive role-model for his daughter, as well as his broader positive influence as an employee and volunteer. As Kahdaffie's mother, Jennie McNeal, explains, Kahdaffie has a family and community that "love him and stands ready to support him as he continues to work toward a productive and law-abiding future," and "he has the ability to learn from his mistakes, contribute positively to society, and be a devoted father, son, and family member." (Ex. 10.) Captain Corey Hughes from the Salvation Army likewise emphasizes "the strength and support of the family surrounding this young man," which "is often one of the most critical factors in rehabilitation and long-term success" and significantly reduces the likelihood of reoffending. (Ex. 11.)

Research likewise shows that Kahdaffie's pro-social activities and support system are positive factors and suggest that, when they are combined with a 90-month sentence, Kahdaffie will succeed in reintegrating into society. Bunting et al. at 712–33 ("Consensus among research would indicate that overall, individuals who have stable and supporting social networks, support for their substance use disorder and/or other health issues, stable housing, and employment are

most likely to remain in the community." (citations omitted)). In addition to the counseling he has already participated in, Kahdaffie is willing to take any appropriate mental, substance, or alcohol-related treatment steps upon release.

This is supported with a recidivism study conducted by the U.S. Sentencing Commission, which found that several factors relevant to Kahdaffie decrease the likelihood that someone will reoffend following release. U.S. SENTENCING COMM'N, THE EFFECTS OF AGING ON RECIDIVISM AMONG FEDERAL OFFENDERS (Dec. 2017).[9] Age was perhaps the strongest factor and the study found that recidivism rates decreased as the age of the prior offender increased and that, once prior offenders reached their mid-thirties, the reconviction rate decreased to less than one-third among the group. *Id.* at 23. Recidivism rates also were lower for prior offenders who had completed high school and who were released from federal rather than state prison. *Id.* at 24, 27. "Sentencing judges need to consider the phenomenon of aging out of risky occupations," since "[v]iolent crime . . . is generally a young man's game."). *United States v. Presley*, 790 F.3d 699, 702 (7th Cir. 2015). This supports Kahdaffie's intention for his instant sentence to be his last, particularly when considered the other factors that make him unlikely to reoffend, such as his ability to life in a low-crime neighborhood with a supportive family, his employment and volunteer opportunities, and his desire to be a role model for his young daughter. Given Kahdaffie's increasing age and his other positive factors—his family and community support. rehabilitative efforts so far, and plans upon release—imposing even a guideline sentence is not necessary to protect the public. *See id.* (doubting "that very long sentences reduce violent crime significantly").

[9] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf

### C. § 3553(a)(2)(D): A below-guideline sentence would help Kahdaffie pursue his potential

As explained by the probation office, Kahdaffie has the potential to be a successful member of society and to contribute to his community. (*See* PSR, Sentencing Recommendation at 2 (discussing Kahdaffie's "untapped potential").) He was a successful student and athlete in his youth, was a volunteer football coach, and maintained legitimate employment. Unfortunately, his past trauma and resulting drug and alcohol use interfered with Kahdaffie's mindset and goals, and he turned to criminal activities that took him away from who he wanted to be. Nevertheless, Kahdaffie is recommitted to pursuing educational or vocational training and meeting his potential, such as earning a commercial driver's license and one day starting his own trucking business. The longer he is incarcerated, the longer Kahdaffie must wait until he can pursue these efforts outside of prison and the more remote the possibility that Kahdaffie is able to do so after a lengthy prison term. A below-guidelines sentence thus would help provide Kahdaffie with educational and vocational training. *See* 18 U.S.C. § 3553(a)(2)(D).

## VI. A SENTENCE OF 6 MONTHS PLUS 84 MONTHS REFLECTS THE SERIOUSNESS OF THE OFFENSES, IS A JUST PUNISHMENT, IS A SUFFICIENT DETERRENCE, AND CONSIDERS THE PROTECTION OF THE PUBLIC AND REHABILITATION

"[S]entencing is never abstract: the district court is required by statute to tailor its sentence to the particular defendant before it." *Solomon*, 892 F.3d at 279. Kahdaffie's proposed sentence reflects the nature and circumstances of the offense, is a just punishment, considers Kahdaffie's role in the offense, is sufficient deterrence, and appropriately considers the need to protect the public. No matter what, Kahdaffie will receive a significant custodial sentence in the Bureau of Prisons. Research has shown "increases in the *certainty* of punishment as opposed to the *severity* of punishment are more likely to produce deterrent benefits." VALERIE WRIGHT, DETERRENCE IN CRIMINAL JUSTICE: EVALUATING CERTAINTY VS. SEVERITY OF

PUNISHMENT 1 (2010) (emphasis in original). Accordingly, "[e]xisting evidence does not support any significant public safety benefit of the practice of increasing the severity of sentences by imposing longer prison terms. In fact, research findings imply that increasingly lengthy prison terms are counterproductive" and that deterrence "would not be substantially diminished if punishments were reduced." *Id.* at 9.

As reflected in Kahdaffie's offense-level reduction, Kahdaffie knows what he did was wrong and has accepted responsibility for his conduct. He evinced this acceptance at the change-of-plea hearing on November 20, 2025. He did not waste judicial resources by pleading guilty at the eleventh hour before trial. *See United States v. Pilon*, 734 F.3d 649, 652–53 (7th Cir. 2013). Kahdaffie then cooperated during his presentence interview. These actions of acceptance and remorse further reflect his commitment to rehabilitation and justify a below-guidelines sentence.

In addition to the significant education and personal gains Kahdaffie has already undertaken while in custody, he hopes to pursue college or learn a trade and continue his rehabilitation-focused coursework so that he can support himself, his daughter, the rest of his family, and his community once he is released. He was an honor roll student in high school but unfortunately could not pursue higher education because of financial constraints and dealing with the effects of trauma. Still, Kahdaffie applied himself to working and volunteering and has shown great ability to better himself and those around him and be a supportive father while avoiding the criminal mindset and activities that previously brought him into the criminal justice system. Indeed, he has already taken big steps by cutting out negative relationships, reading and learning about self-improvement and positive decision-making, becoming more grounded in his family relationships, and heroically preventing a fellow inmate's suicide.

A 90-month total sentence (6 months for Count 2 and 84 months for Count 3) reflects the seriousness of Kahdaffie's conduct and the need for protection and deterrence while also considering Kahdaffie's lesser role in the crime and the need not to impose a sentence that is greater than necessary. *See Presley*, 790 F.3d at 703 (where a defendant is likely to age out of criminal activity, "consideration of those goals is likely to argue for a relatively lenient sentence"); *United States v. Robles*, 828 F. Supp. 2d 626, 633–34 (S.D.N.Y. 2011) (applying downward departure where Robes "is currently 29 years of age," "is in a committed relationship and is the father of a young son, aged 9," "has a supportive family," "[n]o one was injured in the course of [the robberies]," and "[e]ven under the mandatory minimum term, Robles will be well into middle age when released to the community"). Kahdaffie has shown an ability and willingness to be a positive member of his community and will continue on that path in the future with his family's support.

The probation office likewise believes that a below-guideline sentence would adequately address most of these factors and ultimately recommends a below-guideline sentence. (PSR, Sentencing Recommendation at 3–4.)

## VII. CONCLUSION

Kahdaffie requests a sentence of 6 months for Count 2 and 84 months for Count 3, to run consecutively for a total of 90 months, followed by a period of supervised release,[10] and with financial penalties waived. This sentence appropriately considers the nature and circumstances of Kahdaffie's offenses, is a just punishment, is sufficient deterrence, and properly considers the need to protect the public, without applying more punishment than necessary under § 3553(a).

---

[10] Kahdaffie does not object to the conditions of supervised release proposed by the probation office.

Respectfully submitted,

s/ Jonathan S. Bedi
Jonathan S. Bedi
Dena M. Singer
Matthew Lind
Bedi & Singer, LLP
53 West Jackson Blvd., Suite 1101
Chicago, IL 60604
(312) 525 2017
jbedi@bedisinger.com
**Attorney for Defendant**

## Certificate of Service

I, Jonathan S. Bedi, hereby certify, I caused a copy of the foregoing Motion to be served on upon the Assistant United States Attorney by causing it to be electronically filed with the Clerk of the Court using the CM/ECF system.

/s/ Jonathan S. Bedi
Jonathan S. Bedi